## McCANN v. NEW YORK STOCK EXCHANGE et al.
### No. 18.

Circuit Court of Appeals, Second Circuit.

Nov. 13, 1939.

Gene McCann, pro se.

Charles H. Tuttle, of New York City, for appellees.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

■ This is an appeal from a judgment entered upon the verdict of a jury for the defendants. The action was to recover treble damages against the defendants under the Anti-Trust Acts, 15 U.S.C.A. § 1 et seq., for destroying the plaintiff's business as a stock-broker in the City of New York. The theory of the complaint was that the defendant, Better Business Bureau of New York, in conjunction with the New York Stock Exchange, its officers and members, and a large number of other persons, conspired to drive the plaintiff out of business in order to rid themselves of his competition. To do so they spread broadcast by letters and leaflets that he was a person unreliable morally and financially, with a record of criminal convictions. The case was tried to a jury and, as a verdict was taken, nothing is open upon this appeal but the supposed errors in the conduct of the ·trial. These were of three kinds: (1) the summation of the defendants' counsel; (2) an instruction given to the jury by the judge; (3) certain rulings in the admission and exclusion of evidence.

■ It is true that the summation was extremely denunciatory, but the passages objected to consisted for the most part of vehement comments upon the plaintiff's conduct in the past which had been undubitably proven. Not only did the plaintiff not object at the time, or after the speech was concluded, but he has not assigned any part of it as error. While we may take notice, *nostra sponte,* under Rule 10, of "plain error" which is not assigned, we are certainly not disposed to exercise that power in this case. Indeed, we cannot find anything which could be thought to have gone beyond tolerable limits, unless it be the argument that the jury should discredit the plaintiff because he did not shield his brother by keeping information about him from the public authorities. Most people would probably regard it as shameful to betray so near a relative, and it was at least open to doubt—whatever the legal duty to disclose the information—whether the argument was not permissible. However that may be, it would be wholly unwarranted after so long a trial to reverse the judgment upon such an objection, neither raised at the time, nor assigned a year later when manifold other assignments were prepared.

■ The next objection has more substance. As we have said, the action was for damages growing out of a conspiracy to destroy the plaintiff's business. The judge in his charge stated the law correctly in a general way, but in one passage, in speaking of information given out by the Bureau of the plaintiff's "criminal record", he said that "if that information was true, the Better Business Bureau, regardless of its pur-

pose in disseminating the information, would not be liable, is not liable, because no person or firm can be liable for telling or publishing the truth". Later on he repeated more to the same effect. When he had finished, the plaintiff took no exception to this, or to anything else, but made the following request: "May I ask your Honor to charge that by 'truth' you mean a substantially fair and full-fact comment on matters referred to?" To this the judge answered: "No. I will charge you again, gentlemen, that no person or firm is liable, regardless of the purpose with which it is published, for publishing facts that are true". Whereupon the plaintiff then replied: "I take an exception to that statement". The judge could only have understood the exception as directed to his refusal to qualify his original charge; that is, to add that the defendants, besides stating the bare facts, should have made full and fair comment upon them. That request was rightly refused. Apparently it was based upon the doctrine in defamation that if one comments upon another's conduct in such a way as to defame him, it will not be an excuse that the facts commented upon are true, unless the comment itself expresses one's real opinion and is not uttered merely to injure him. Restatement of Torts, § 606. The doctrine did not apply to the case at bar, even if it had been an action for defamation, because the Bureau did not comment upon the plaintiff's conduct at all, but confined itself to a bare statement of the facts. It may sometimes indeed be true that one may defame another by stating so little as in the end to leave a false impression. Perhaps this was what the request was meant to reach; that is, that if the Bureau broadcast the plaintiff's convictions for stealing, it should have added that these were committed when he was eighteen and twenty-four years old. But the statements were not by themselves misleading; and there was no duty to palliate the plaintiff's crimes, which had been several and grave. The request assumed the applicability of the test in defamation, and was as out of place as indeed the original charge had been in an action of this kind. Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518; Duplex Printing Press Co. v. Deering, 254 U.S. 443, 465, 466, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Lamar v. United States, 2 Cir., 260 F. 561. But the plaintiff cannot complain that the original was not proper for he raised no such question; and it does not inevitably follow that, if the judge had been asked to reconsider this part of what he said, he would have refused.

■■■■ Moreover, if what the Bureau did say about the plaintiff was true, it was not guilty anyway, not because truth is a defence in such actions, but because in this particular case there was no other evidence to support a verdict. To be actionable the combination or agreement must be unlawful in means, or in end; the only unlawful means posssible were the utterances about the plaintiff, the truth of which the judge did leave to the jury. The end avowed— ridding the business of unscrupulous persons—was not only lawful, but commendable, and while the defendants *may* have had other motives, that had to be proved and could not be assumed. To spread abroad what it had learned did not tend to show that its true purpose was not what it avowed, if the facts were so; indeed the Bureau would have been recreant to its duty, if it had suppressed the information, which, *prima facie* at least, showed the plaintiff to be unfit for the business. It did not volunteer the information; it was not until the New York Times inquired of it, that it used it at all; and although the plaintiff swore that thereafter it repeated the charges, that was not alone enough to support a finding of improper motive. Nor is there any substance to the charge that the Bureau favored its members either in making charges, or in publishing such charges as it proved. It is true that the New York Stock Exchange did not after 1929 publish the names of those of its members whom it had itself disciplined, but there is not the slightest evidence that it had ever tried to prevent the Bureau from proceeding against any; and in several instances it was shown that the Bureau had pressed to a conclusion charges against its own members. Even if it drove out of business the Consolidated Exchange in New York and the Boston Curb Exchange, that too proved nothing, because, for aught that appears, it was desirable to do so. Thus, even if any objection had in fact been taken to the charge about "truth", it would not have justified a reversal.

■■■■ There remain the objections to the admission and exclusion of evidence. The first is that the judge refused to compel the New York Stock Exchange to produce "records * * * concerning any investigations asked by the Stock Exchange or any of its members". The hope was ap

parently that these would show that the Stock Exchange favored its members, and used the Bureau only to eliminate competitors. The Exchange did produce a very large number of documents, including all "literature" which it had received from the Bureau. Probably we should not assume that "literature" included any answers of the Bureau to requests made for investigations, if any were made; and we must own that we do not see why the judge should have refused to comply with the plaintiff's request, though it is the merest speculation that compliance would have changed the result. It was natural enough, however, that he should have called a halt to the plaintiff's endless demands for documents on the mere chance that something might be turned up that would be useful. If the refusal was an error, it was at least no ground to reverse the judgment.

The next objection was that the plaintiff was not allowed to show how widespread was the publication of the defamatory material; that is, that it went very generally to brokers and dealers in securities, including some who dealt with him. This might have been relevant, had the jury found in his favor; but as it went only to the extent of his damages, it was immaterial. He also objected to the judge's refusal to let him prove that the Exchange did not publish the fact that several of its members had paid financial writers on the New York papers; the implication once more being that it favored its own members, and had not been actuated by a sincere desire to better business. This information came out—according to the plaintiff's offers of proof—at a public hearing before a Congressional committee in Washington, and was published widely in the newspapers; it is difficult to see what service the Exchange and the Bureau would have done by adding to this publicity. Even were we to suppose that it might have helped by emphasizing what was already known, the inference of bad motive from the failure to do so was so tenuous as to make the error, if it was an error, of slight importance.

The next objection was the refusal to admit in evidence an editorial in "Printers' Ink" which very mildly criticized the Bureau, and suggested possible changes in its methods. On what theory this could have been competent passes our comprehension. The same applies to the exclusion of a number of the Congressional Record, containing a brief of one, Hardeman, printed by the request of Senator Brookhart.

The next objection was to the exclusion of reports and broadsides of the Better Business Bureau of St. Louis, of the same general character as those of the New York Bureau. Since the St. Louis Bureau was acting in concert with the New York Bureau, it is argued that these were the acts of a conspirator in pursuance of the conspiracy. Theoretically, this may be true, but the documents would have added nothing probative unless it was to show the combination, and that was otherwise amply proved. If they were otherwise admissible, it could only have been as to the extent of the publication, and therefore as to the damage done.

The next objection was to the denial of the plaintiff's right to testify that his customers said that they would not deal with him because of the publications of the Bureau. Assuming that this hearsay was competent under any of the recognized exceptions, again, the worst that can be said is that it went only to the damages. The same applies to the reasons given by the New York Times for discontinuing his advertising, except that in this case the testimony was of the person who himself talked to the plaintiff.

The last objection is to the limited admission of the minutes of the Better Business Bureau. This book was produced in court and submitted to the judge, who ruled that the plaintiff could not inspect it, but that any parts of it which the witness on the stand found to concern the plaintiff should be read. The plaintiff wished to examine the whole book, but, although he was entitled to inspection at the trial, he was not, before the New Rules, 28 U.S.C.A. following section 723c, entitled to a general inspection. § 636, Title 28, U.S. Code, 28 U.S.C.A. § 636. Keenan v. Texas Production Co., 10 Cir., 84 F.2d 826; Pressed Steel Car Co. v. Union Pacific R. Co., D.C., 241 F. 964, 967. Since the inspection was then permitted only at trial, the proper course was to submit the document to the judge to decide whether it was pertinent. We of course have power to review his ruling, but there is nothing to show that there were material parts of the minutes which were excluded but which should have been admitted.

914

In general the plaintiff was given the utmost latitude throughout the trial; the documents introduced fill eighteen volumes of the record; the typewritten narrative covers more than 800 pages; the case took three weeks to try. The plaintiff's principal witness was himself, most of the others being hostile. The jury had ample means of gauging the truth of what he said, and the motives which actuated the defendants; their verdict was amply sustained by the evidence, and it would be a patent miscarriage of justice to disturb it.

Judgment affirmed.