**UNITED STATES ex rel. McCANN v. ADAMS, Warden, et al.**

District Court, S. D. New York.
Jan. 26, 1944.

James B. M. McNally, U. S. Atty., of New York City (Richard J. Burke, of New York City, of counsel), for relator.

Gene McCann, pro se. (Hallam H. Richardson, of Brooklyn, and John F. X. Finn and Thomas L. J. Corcoran, both of New York City, of counsel), for respondent.

HULBERT, District Judge.

This is a judicial inquiry in a habeas corpus proceeding remanded by the United States Supreme Court (United States of America ex rel. Gene McCann v. Wm. A. Adams, Warden, etc., 320 U.S. 220, 64 S.Ct. 14.

In a per curiam opinion the court said, in part:

"This proceeding is a sequel to Adams v. United States ex rel. McCann, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. [268], 143 A.L.R. 435. We there reversed an order of the Circuit Court of Appeals of the Second Circuit discharging the present relator from custody. * * * We did so because we held that, if his waiver was the exercise of an intelligent choice made with the considered approval of the trial court, he could as a matter of law waive his right to a jury trial without being represented by counsel. After the case went back to the Circuit Court of Appeals on mandate and further steps not necessary here to recount were taken, the relator filed a petition for a writ of habeas corpus in the District Court which, with supporting affidavits, adequately raised the issue whether in fact he intelligently—with full knowledge of his rights and capacity to understand them—waived his right to the assistance of counsel and to trial by jury. That issue, as appears from our former opinion, was explicitly withdrawn from consideration on the habeas corpus proceedings previously before the Circuit Court of Appeals [2 Cir.] 126 F.2d 774. That issue, now fairly tendered by the petition for habeas corpus below, has never been adjudicated on its merits by the lower courts. But it is no longer within the bosom of the trial court. Nor can it be disposed of on the appeal of his conviction, for the claim rests on materials dehors the trial proceedings. It is a claim which the relator should be allowed to establish, if he can."

The primary issue thus presented to this court for determination is whether the relator "intelligently—with full knowledge of his rights and capacity to understand them—waived his right to assistance of counsel and to trial by jury."

A secondary issue is asserted by the relator and his counsel, viz: a right to present any "claim which rests on materials dehors the record."

It seems appropriate to set forth at the outset the background of these proceedings.

The relator, a man about 50 years of age, a stockbroker, has for a number of years specialized in the organization of

corporations and advising his clients with respect to the procedural requirements and compliance therewith, regulating the issuance of and dealing in securities. For a time he made use of the facilities of the office of one John T. Tobin, Esq., a member of the bar of this Court, whom he sometimes employed as counsel in such matters.

On February 18, 1941, the grand jury of this District returned an indictment charging Gene McCann in six counts, with the use of the United States mails in furtherance of a scheme to defraud, in violation of Sec. 338 of Title 18 U.S.C.A.

Although the defendant claimed the privilege of a confidential relationship when Tobin was called before a grand jury of this District, after the filing of the indictment herein, he testified it was with the assistance of one or more law students attending the Columbia University Law School, that motion papers were prepared and a motion was brought on to challenge the legality as well as the sufficiency of the indictment. That motion was denied.

Meanwhile, he was called upon to plead to the indictment and, because of the pendency of that motion, stood mute. The judge presiding entered a plea of "not guilty" on April 2, 1941, and the defendant was continued on his own recognizance.

The Court granted a request of the defendant to proceed in forma pauperis, but an order thereon was not formally entered until June 16th, 1941.

The case came on for trial July 7, 1941, before a visiting judge who had been for that term assigned to preside in the Call Part (Room 318) of the Criminal Division of this Court.

About July 1, 1941, the defendant had caused to be issued a large number of subpoenae and subpoenae duces tecum and had placed them in the hands of the U. S. Marshall for service. He had also endeavored to retain counsel but stated he was unable to do so because of his impecunious circumstances.

When the case was called for trial he applied for an adjournment, which was denied. He did not assign as one of his reasons therefor, his inability to secure counsel. After the call of the calendar on July 7, the United States Attorney moved for trial of the indictment against McCann. There was some d‑‑ussion which the court stenographer did‑ n( .ake

down in his notes. At all events, the very first statement in the transcript of the Court Reporter's minutes reads:

"Mr. McCann: I move the court to try the case of the United States of America v. Gene McCann without a jury and have the case tried by the presiding judge."

"The Court: Defendant, in his own proper person, having moved for a trial of the case without a jury and having said in open court he will sign the consent as soon as drawn, and the Government consenting, the motion is granted. If counsel wishes to make any motion in addition I want the record to show what the application is, who the witnesses are who have not been served, what they will testify to, so that I can determine whether their testimony is material or not material."

Assistant United States Attorney Donohue, testified that he visited the library later on that day and dictated to a stenographer, a waiver of a jury trial in conformity with the opinion of the court in Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L. Ed. 854, 70 A.L.R. 263. This was presented to and signed by McCann, by the Assistant United States Attorney conducting the trial for the Government, approved by the Judge, and filed with the Clerk of the Court, and reads as follows:

"I, Gene McCann, the defendant herein, appearing personally, do hereby waive a trial by jury in the above entitled case, having been advised by the Court of my constitutional rights."

Before the opening addresses to the Court a number of motions by or on behalf of prospective witnesses, who had been served with subpoenae issued by McCann to the U. S. Marshal, and motions by the defendant to dismiss the indictment, were taken up by the Court. Upon the disposition of these motions after the mid-day recess, the United States Attorney opened for the Government; Mr. McCann followed, and the taking of testimony began. The trial was concluded on July 22, 1941; the Court found McCann guilty upon all counts, made findings of fact and conclusions of law and imposed a sentence of 6 years and total fines of $600.

The defendant undertook to appeal but claims he was unable to perfect it since he was without funds to procure a copy of the transcript of the stenographer's minutes consisting of 1139 pages. He endeavored to prepare and file a bill of exceptions

from his own notes taken at the trial, fortified by his recollection.

In February 1942, while McCann was before the Circuit Court of Appeals, Second Circuit, on a writ of habeas corpus, in connection with his efforts to perfect his appeal, he met Frank J. Walsh, Esq., a member of the bar of that Court, upon whose advice he brought to the attention of that Court, the claim that he had illegally waived his constitutional right to trial by jury, without the advice of counsel. The Court appointed Mr. Walsh to represent McCann, on whose behalf a petition for a writ of habeas corpus was presented to the Appellate Court and such proceedings were had (not necessary to detail here) that McCann was released from custody on nominal bail, in an opinion in which it was, in part, stated:

"We hold that when on trial for a felony, the accused—at least when not himself a lawyer—may not consent to be tried by a judge except upon the advice of an attorney, retained by him, * * * even though that advice extends to no more than that particular choice." 2 Cir., 126 F.2d 774, at page 776.

The United States Attorney applied to the United States Supreme Court for a writ of certiorari, which was granted and, by a divided court (Adams v. United States ex rel. Gene McCann, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268, 143 A.L.R. 435) the order of the Circuit Court of Appeals was set aside. Mr. Justice Frankfurter, writing for the majority of the Court, said at page 281 of 317 U.S., at page 242 of 63 S.Ct., 87 L.Ed. 268, 143 A.L.R. 435:

"If the result of the adjudicatory process is not to be set at naught, it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality. Simply because a result that was insistently invited, namely, a verdict by a court without a jury, disappointed the hopes of the accused, ought not to be sufficient for rejecting it. And if the record before us does not show an intelligent and competent waiver of the right to the assistance of counsel by a defendant who demanded again and again that the judge try him, and who in his persistence of such a choice knew what he was about, it would be difficult to conceive of a set of circumstances in which there

was such a free choice by a self-determining individual."

McCann subsequently filed in the District Court a voluminous petition for a writ of habeas corpus which came on for hearing before my colleague Judge Leibell. McCann appeared pro se. The Court, in a lengthy opinion, dated April 20, 1943 (unreported) denied the petition but appointed Hallam M. Richardson, Esq., and Morris Gottlieb, Esq., "who have acted for Mr. McCann in some of his civil litigations as appears from their affidavits submitted by him on this present application * * * to take such steps as they may deem advisable and as may be approved by petitioner" to review said decision, which was affirmed by the Circuit Court of Appeals, 2 Cir., 136 F.2d 680.

McCann then applied to the United States Supreme Court for a writ of certiorari. Upon consent of the Attorney General the case was remanded in a per curiam opinion dated Nov. 8, 1943, 320 U.S. 220, 64 S.Ct. 14, and the present hearings which commenced on Nov. 22nd, 1943 and have continued intermittently, were had pursuant to the mandate entered thereon.

At the outset of these proceedings the United States Attorney filed a very lengthy return, and the following colloquy occurred:

"The Court: I understand that a copy of this return was not served on you until a few moments ago?

"Mr. McCann: That is right.

   *     *     *     *     *

"The Court: Of course, one thing that you will want to decide is whether you desire to file a traverse or whether you desire to stand on the petition and the return. Have you an attorney?

"Mr. McCann: No, I do not have an attorney.

"The Court: Do you want the Court to assign an attorney?

"Mr. McCann: No, your Honor. I want to represent—it would take weeks and weeks for an attorney to familiarize himself with the facts. I have been studying this particular subject for, I daresay, a long time, and on this particular thing I do not think—I tried the case myself; I would like the assistance of Mr. Richardson to help me in the matter, but I do not think that he knows enough about it, and it would take him so long to familiarize himself with it. I would like to appear

myself if there are to be any hearings on the matter. Now what I would like is to traverse the return and have the hearings begin Monday and leave the Court to get out my subpoenas. I would like to subpoena first the foreman of the grand jury and the respective members of the grand jury.

"The Court: In the first place, the Court feels that you should have counsel. It may be that you are more familiar with the facts in this case than anyone else and that no one could within any reasonable time become as familiar with the facts as you are, and perhaps, so far as handling this case on the facts is concerned, even though some lawyer might acquaint himself with them to the extent that you have, you still might be able to protect your own interests better than he, but nevertheless there are involved here some very interesting and at least one very novel legal proposition, and even though you have been living with this case for a number of years you cannot have the knowledge with respect to the law which applies that one who is skilled in the profession would have. And you certainly ought to have available the services of an attorney, counsel with whom you may confer if, as and when you wish to do so. Now, is Mr. Richardson here?

"Mr. Richardson: I am, your Honor. I know considerable about this, mostly in a factual way, too. I would be glad to assist, but I do not feel like taking the assignment of counsel. If there is counsel assigned I will assist counsel as I have at these trials before. But these questions are novel, they are interesting, but my practice has not been along these lines, and while I am more trained in the law than Mr. McCann—

"The Court: I realize that.

"Mr. Richardson:—he has these unusual facts in the way that I do not * * *

"The Court: I will endeavor to ascertain if I can get counsel to assist."

Thereafter the Court appointed John F. X. Finn, Esq., Professor of Law at Fordham University and Thomas J. Corcoran, Esq., an associate of Professor Finn, and they have fully cooperated with Mr. Richardson who has been most diligent and indefatigable.

Realizing the extent to which the assignment of these gentlemen would handicap them in their private practice, the Court suggested and the relator agreed that the proceedings would be had at the afternoon session of court each day so that the regular matters on the calendar call in the Criminal Part could be taken care of at the morning session and the cases on the calendar which the Court undertook to try at the November and December Terms were adjourned for the day when the midday recess was taken, unless the relator or his counsel asked to be relieved from going on with these hearings on that particular afternoon.

Where no statute or rule governs, counsel for petitioner states it has been learned, upon inquiry, that different practice exists in various neighboring District Courts and urges the application of procedure unknown to us.[1]

---

[1] The author of this opinion believing that a plea of guilty is a waiver of the constitutional right of trial by jury, has made it an invariable practice to appoint counsel for a defendant appearing before him without counsel and desiring to plead guilty, affording the defendant an opportunity to confer with his counsel, and then propounding to him a stereotyped set of questions to ascertain that the defendant understands the nature of the charge, has fully and fairly stated the facts to his counsel, by whom he has been advised of his legal rights and that he desires to enter a plea of guilty of his own free will and without any mental reservations because he believes he is guilty.

In the case of United States v. Chaperau (S.D.N.Y)* indictments number, 3,- 409, 103,488, 103,489, and 10 he defendant was charged with smug r- chandise in violation of the statu t-

ing to Customs. His defense was that he was an accredited diplomatic representative of a Central American Republic and that he had brought such merchandise into the country under his diplomatic immunity. After a demurrer to the indictment had been overruled and motions attacking its validity had been denied, he sought to discharge his counsel and requested a trial to the court without a jury. The judge (Hulbert) refused to relieve his counsel, formulated a series of questions based upon Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854, 70 A.L.R. 263, and then prepared and presented a waiver which was signed by the defendant and the prosecuting attorney, approved by the court, and entered in the minutes, and the case was tried to the court which found him guilty and imposed sentence.

* No opinion for publication.

This case is not to be decided in accordance with what the practice of a particular judge has been, or what we may believe the procedure should be or has been, but, in compliance with the mandate and the decision of the United States Supreme Court upon which it is based.

## The Primary Issue

The relator asserts that he never received a copy of the waiver which he signed on July 7, 1941, and never again had an opportunity to read it, until he appeared in the Circuit Court of Appeals in February 1942. In a memorandum which he submitted to that Court upon that occasion, he charged that the waiver was a forgery. This charge is based upon his contention that when he signed the paper the third line ended with the word "case," and that the words following were subsequently inserted. He points out that these additional words are not in alignment with the word "case" and as a matter of fact this is more pronounced in the carbon copies, as is also the comma which, in the original, coincides with the period following the word "case" but in the carbon copies is above the period in one instance and was inserted by pen and ink in another.

This challenge was fully met by the testimony of Mr. Burke and Mr. Donohue. Mr. Johnson, the Clerk of the Criminal Part, Miss Mahoney in charge of the Photostatic Service in the Clerk's Office, and her assistant Mr. Vernon Lewie, and Mr. Burke's stenographer Miss Fannie Jaffee, and the Court finds that the typed wording of the waiver was the same when presented to Mr. McCann and signed by him as when presented at this hearing and received in evidence.

Relator further insists that the phrase "having been advised by the Court of my constitutional rights" is false. The language used by the Court at page 2 of the transcript of the stenographer's minutes of the trial "and having said in open court he will sign the consent as soon as drawn" clearly indicate that some understanding was had before the defendant McCann moved to try the case without a jury and have it tried by the presiding judge. McCann, himself, admitted on the witness stand that he repeated his motion in the exact phraseology previously suggested to him by the Court.

Mr. Burke, the Assistant United States Attorney who tried the case for the Government, testified to a colloquy during the calendar call and to a side bar conference which occurred just before the motion of Mr. McCann on the first page of the typewritten record.

His recollection of the colloquy at the calendar call was that Mr. McCann requested an adjournment and Mr. Burke opposed it. The Court inquired of Mr. McCann whether he was represented by counsel and he replied "No, I am representing myself in this matter." Then the Court inquired: "Are you a member of the bar" and Mr. McCann replied "No, I am not a member of the bar, but I have studied law and I am much more familiar with the very complicated facts of this particular litigation than any lawyer could possibly be, and, therefore, I desire to represent myself in the matter."

The next thing he remembered was the side bar colloquy. Mr. McCann approached the bench and had exchanged a few sentences with the Court while Mr. Burke was on the way up to the bench and when he reached there he heard McCann say: "I want to try the case without a jury" and the Court said "Would that be agreeable to you (Burke)" who replied: "Yes" and the Court then said "Well, that would be agreeable to me also, as long as it is agreeable to both sides; however, there should be a written stipulation entered into regarding the waiver of a jury in the case." Mr. Burke said he would have one drawn and the Court then stated: "When the stipulation is brought back I will submit it to Mr. McCann for signature" and added: "Will you step back there, Mr. McCann, and repeat your motion, so that a record will be made of it" and Mr. McCann did so.

Another case on the calendar had been answered ready and the Court made inquiry of the calendar assistant to ascertain what Parts were open to try the two cases. It appeared there were none and then the Court asked "Which one of these cases are you moving for trial" and the calendar assistant replied "The McCann case."

Mr. McCann testified that while he was under the impression that cases were tried in the calendar part without a jury, he made no inquiry of the Court to ascertain whether that was so, and in any event, he said he preferred to try this case before a visiting judge without a jury rather than try it before any local judge with a jury.

Mr. Bruckheimer, the court reporter, testified that the Court inquired of McCann: "Who represents you" and he replied: "I represent myself."

Mr. Bruckheimer did not have that particular note book; he was taken ill after the trial,—a typewritten transcription of his notes and his note books were sent to him at his home and after he had examined and corrected the transcript he sent it, with the books, back to his office, and upon his return to duty was informed that the books had been taken from his desk and have never since been recovered.

Postoffice Inspector Allen, who assisted Mr. Burke in the trial of the case, testified:

"The judge asked Mr. McCann if he was an attorney and Mr. McCann said he was not. And the judge offered to appoint an attorney to represent him. Mr. McCann said that he was going to represent himself. And the judge asked him if he was qualified to do so, and Mr. McCann said that he believed he was, that he had studied law and appeared in many litigations and believed himself perfectly competent to protect his interest and further, that he was more familiar with the ramifications of his case than other attorney—than any attorney could possibly be, and he thought that he could defend himself better than any attorney for that reason. * * * He stated he did not wish to be tried by a jury; he wished to be tried with the Court. And something was said about his signing a stipulation to that effect, and one was prepared and handed to him and he read it and then signed it and handed it back."

The testimony of the trial judge was taken on oral interrogatories. He testified:

"Finally the case of United States v. McCann was called; of course I never had heard of McCann; I never had heard of the case. Apparently everybody else in New York knew about it but I had never heard of it. A gentleman rose, when that case was called, and began to present matters on behalf of the defendant, various matters; an oral application for resetting of the case, statement of difficulties he had had in obtaining service of his subpoenas for witnesses, and a half dozen such matters. I do not recall what all of them were, of course, after two years. I assumed that he was Mr. McCann's attorney. He was well dressed. I would say he looked as if he were about thirty-five years of age. He

may have been considerably older; he may have been even younger. He handled himself with fine ability, presented his matters clearly and in technical language, many of them. I had no reason on earth to think that he was not an attorney for Mr. McCann, but presently—I do not know exactly now what it was that called it to my attention—presently it dawned upon me that he was McCann himself. When I learned that he was McCann, I said: 'Mr. McCann, don't you have an attorney?' He said 'No, I haven't an attorney.' He said 'I desire to represent myself.' * * * He explained that he had had some litigation in the Supreme Court of New York, which, of course, anybody in New York reading this deposition would know is the trial court; most of us know it is the trial court. He had conducted that litigation, as I understood him to say, at least when it was on appeal in the Court of Appeals, himself, and he was satisfied that he had had so much experience in that and other litigation to which he referred, that he was better qualified to represent himself than any lawyer that would be appointed to represent him. I offered to appoint a lawyer to represent him if he wanted one. He insisted that he desired to represent himself."

According to the trial judge, after the various applications of Mr. McCann had been denied and the Court was informed there was a jury in attendance ready to try any case, Mr. McCann stated "he did not want to try it to a jury; he wanted to try it to the Court." "My recollection is that he paid some kind of a compliment to a foreign judge being in attendance, that he might be less prejudiced against him than local judges, with whom his experience" he said "had not been entirely satisfactory." "When he said he wanted to have the case tried to the Court, I asked the District Attorney to draw up the usual waiver in writing, which the law required in a situation of that character."

The judge acknowledged, and corrected, a mistake in his recollection of the facts contained in a statement which he had prepared since this hearing began, and sent to the United States Attorney, anticipating that he would be examined on written interrogatories. In that statement he wrote that he discovered on the very first day, on the call of the calendar, that Mr. McCann was not a lawyer, but that in fact he had not discovered it until the

second day of the trial that Mr. McCann was not a lawyer.

There are three factors which have been persuasive in determining where the truth lies in deciding this issue:

## I.

In a previous civil action which Mr. McCann brought in the New York Supreme Court he desired to procure an order for leave to prosecute an appeal in forma pauperis. Mr. Justice Leary had ruled that such an action could not be maintained unless an attorney certified that the plaintiff had a meritorious cause of action. Mr. McCann challenged this ruling, went with a lawyer to a law library, examined the cases cited by the Court and sought a reconsideration upon the ground the judge had misinterpreted the law. Upon this hearing Mr. McCann testified that he had not learned from that experience that a lawyer might have been assigned by that Court to represent him and without payment of fee. The New York Civil Practice Rule 36, with which McCann professed familiarity, reads:

"*Order to sue as poor person.* The court to which the petition is presented, if satisfied of the truth of the facts alleged and that the applicant has a good cause of action, by order may permit him to prosecute as a poor person *and assign to him an attorney to prosecute his action or special proceeding, who must act without compensation, except* that if a recovery is had the court may allow such attorney a reasonable sum for his services and taxable disbursements payable out of such recovery. * * *" (Italics supplied.)

That this statute authorized the assignment of an attorney by the court in a civil action, without compensation, did not suggest to Mr. McCann that in a criminal case where his liberty was at stake, he might have asked the Court to assign counsel. He testified that he did not so request the Court because he did not know that he could do so.

## II.

In another action brought by McCann in the New York Supreme Court which came on for trial at about the time the proceedings were pending before the grand jury, which resulted in the indictment here involved, he testified that he was so anxious to get the State Court case to trial, that, although Mr. Richardson, whom he had hoped to have try the case, was then otherwise engaged, as a matter of expediency and to avoid a postponement, he undertook to try the case himself. The following colloquy took place at the opening of that trial, Jan. 21, 1941; questioned by the court (S.M.p.2) McCann testified:

"Q. Do you intend to have any lawyer? A. I don't, Your Honor.

"Q. Are you a lawyer yourself? A. I am not, Your Honor, I studied law.

"Q. Have you studied law? A. I have, Your Honor.

"Q. How long did you study law? A. Two years.

"Q. Where? A. Villanova, I had a course in the LaSalle Institute.

"Q. Villanova is a law school? A. They were at that time, back in 1914.

"Q. Are you a college graduate? A. No, I am not, Your Honor.

"Q. Have you had any other litigations in which you appeared for yourself? A. I have, Your Honor.

"Q. How many, about? A. I think four, Your Honor.

"Q. And you feel competent to conduct this trial yourself without a lawyer? A. I do, Your Honor.

"Q. *You do not want the Court to assign a lawyer to you?* A. *I don't.*

"Q. Are you familiar with the practice that obtains in a trial of this kind? A. I am, Your Honor.

"Q. Have you conducted other trials in this court? A. I did, Your Honor.

"Q. How many, about? A. One.

"Q. One? Have you conducted other trials in other courts? A. Not a trial, on procedural motions.

"Q. You have only conducted one trial here? A. That is right, Your Honor. (Italics supplied.)

On cross examination in this habeas corpus proceeding the relator admitted that his actual attendance at Villanova College was for a period of six weeks; that while he attended classes he did not engage in any study. He admitted there was no course in law at Villanova; LaSalle Institute was a correspondence school and he did not take that course. He admitted that in his zeal to get his case to trial before Judge Cohalan he may have imposed upon the Court.

### III.

For many years, the relator testified, he has devoted himself to the organization of corporations issuing securities subject to the New York State Securities Act (known as the Martin Act, General Business Law, Consol. Laws, c. 20, § 352 et seq.) and the Federal Securities Exchange Act, 15 U.S. C.A. § 78a et seq. He demonstrated a surprising knowledge of the statutory requirements of various States having so-called "Blue Sky Laws". He said he had organized at least 500 corporations, that is— he had prepared the certificates, subject to the approval of counsel and had advised the incorporators with respect to the procedural requirements to comply with the law regulating the issuance of and dealings in securities, and that he had been employed by many lawyers to advise them with respect to such procedural matters with which they were not as familiar as he was.

Paradoxical as it may seem, McCann asserts that in procedural matters involving the issuance of securities by corporations requiring highly specialized services, countless lawyers engaged him—a layman—to advise them, yet, professing a total unfamiliarity with technicalities in the conduct of criminal cases he jeopardized his liberty and freedom without asking the court to assign counsel expert in criminal procedure to advise him and safeguard his rights. But this is not surprising to one who has had the opportunity over a period of weeks to study Mr. McCann and the documentary evidence written or compiled by him.

Although he testified he left school in the fourth grade, he is keen, astute and intelligent and has been an unremitting student over a period of years of legal questions affecting his business and personal interests.

■ This is a civil proceeding but it is not believed that Rule 52 of the Federal Rules of Civil Procedure following Sec. 723c of Title 28 U.S.C.A. requires findings by the Court. Rule 81(a) (2), F.R.C.P.

But, this Court will make the following finding of fact and conclusion of law based upon its opportunity to observe the witnesses who gave their testimony in open court and after having carefully reviewed the documentary evidence in this case:

### Finding of Fact

1. The waiver by Gene McCann of the right to employ or have counsel assigned to him and the right to trial by constitutional jury was the exercise of an intelligent choice, with full knowledge of his rights and capacity to understand them.

### Conclusion of Law

1. The relator Gene McCann legally waived the employment or assignment of counsel and trial by constitutional jury.

### The Secondary Issue

There were numerous claims made by the relator of his right to offer proof of materials dehors the record. As to some the Court received evidence and as to others excluded it, but gave the relator's counsel the opportunity to make his offer of proof upon the record.

A. It appears that McCann made some complaint to Hon. John T. Cahill, then U. S. Attorney for the Southern District of New York, in July 1939, and again in February 1941 he opposed the appointment of Hon. Mathias F. Correa, who had been Mr. Cahill's Chief Assistant, as his successor, and submitted objections to confirmation to the Judiciary Committee of the United States Senate.

B. For some time prior to Jan. 1, 1941, McCann's activities had been the subject of an investigation by the Post Office Department. When Inspector Allen brought them to the attention of the United States Attorney for this District, Richard J. Burke, Esq., Assistant United States Attorney in charge of the Criminal Division, issued a request subpoena for Mr. McCann, who, upon receipt thereof, conferred with two attorneys having offices in the suite of Mr. Tobin. It appeared from this subpoena that it was desired to interrogate him in regard to an alleged conspiracy. These attorneys procured and furnished Mr. McCann with a copy of the statute (Title 18 U.S.C.A. § 88). They did not advise him that the subpoena was compulsory. When he responded in accordance therewith, he was accompanied by a Mr. E. C. Riegal, a writer on economic subjects who appears to have collaborated with McCann and from whose writings Mr. McCann has extracted and utilized expressions of Mr. Riegal in drafting his petition herein.

Mr. McCann's examination by Mr. Burke, in the presence of Mr. Riegal, was stenographically reported and from the testimony of Mrs. Mahoney, who recorded it in shorthand, and the testimony of Mr. Burke, it appears to my satisfaction, although denied by both McCann and Riegal, that the relator was first apprised of his constitutional rights, and testified freely. Relator and his counsel were offered a typewritten transcript of Mrs. Mahoney's notes but did not avail themselves of it. Mr. McCann's complaint is that while he was subpoenaed and interrogated respecting an alleged conspiracy, he was indicted for mail fraud, and that upon the trial of the indictment, information which he gave upon such examination to Mr. Burke was used by the latter in McCann's cross examination. Objection was made during the trial and it is not dehors the record.

C. On January 22, 1941, prior to his indictment, McCann had had litigation in the State Court as well as in this Court, against the New York Stock Exchange and its entire membership individually and the Better Business Bureau.[2] It is his claim that the indictment was instigated because of this litigation. He made that the basis of a complaint in a communication which he addressed and delivered personally to the foreman of the grand jury which returned the indictment here involved. He sought the indictment of Mr. Burke and Postoffice Inspector Allen, and complains that the grand jury not only failed to indict Burke and Allen, but refused to give McCann a hearing. He knew that Douglas Green was the foreman of the grand jury and that Green was a member of the firm of Post & Flagg who had membership in the New York Stock Exchange. He had had dealings with Post & Flagg and knew Mr. Green. He knew that Mr. Albert C. Simmons, Jr., another member of the Grand Jury was and still is Vice President in charge of the Credit Department of the Bank of New York & Trust Company, and that Mr. John H. C. Templeton, Secretary of the Grand Jury, was and is the Secretary and New York representative of the First National Bank of Chicago, and asserts that the Bank of New York & Trust Company was a member of the Better Business Bureau and had come into the possession of and utilized information concerning McCann and his dealings with the New York Stock Exchange in the operation of the Credit Department of the Bank.

■ He brought these objections to the attention of the Court on his motion to dismiss the indictment before the plea of not guilty was entered for him and he requested the court to grant a hearing for the purpose of ascertaining the qualifications or the disqualification of these jurors (and any others). The Court had power to do so. The motion was denied.

Sec. 554a, Title 18 U.S.C.A., recognizes that the proper method of challenging the qualification of grand jurors is by plea to abate or motion to quash which shall not be sustained if it appears that 12 or more jurors, after deducting the number so disqualified, concurred in the finding of said indictment, and continues:

"That no juror shall be permitted to testify, in this connection, as to whether he or any other individual juror voted for or against the finding of such indictment, but it shall be the duty of the foreman of each grand jury to keep a record of the number of grand jurors concurring in the finding of any indictment and to file such record with the clerk of the court at the time the indictment is returned. Such record shall not be made public except on order of the court."

D. The grand jury took up the McCann case on Jan. 22, 1941, and heard evidence on that day and on Jan. 24th, Jan. 27th and Jan. 28th. Upon the latter date it voted the indictment but a true bill was not handed up in open court until Feb. 18, 1941, 22 members then being present. The record shows that on Jan. 28, 1941, there were only 20 members present, and that Messrs. Green and Simmonds had disqualified themselves and took no part in the proceedings except that Mr. Green endorsed the indictment as foreman.

There is also some question whether grand juror Hutton was present when the indictment was voted. It was conceded upon the trial of the indictment that he was not, and I will accept that concession here, which reduced the number of grand jurors present on Jan. 28th, to 17. It further

[2] McCann v. New York Stock Exchange, 2 Cir., 107 F.2d 908, Petition for writ of certiorari and for leave to proceed further in forma pauperis denied 309 U.S. 684, 60 S.Ct. 807, 84 L.Ed. 1027; petition for rehearing denied, 310 U.S. 656, 60 S.Ct. 974, 84 L.Ed. 1420.

appears that 5 of the grand jurors were absent on at least one day when some testimony was heard. The relator contends the number of qualified jurors was thereby reduced to 12. However, I find, upon an examination of the record, that 3 of these grand jurors, who may not have heard all of the testimony, were included among those absent on the day when the indictment was voted. It is further contended by the relator that upon an examination of each member of the panel, he could prove that at least 4 or 5 were likewise disqualified by reason of their association with firms or corporations having membership in the New York Stock Exchange or the Better Business Bureau, thereby reducing, according to his computation, the number of qualified voters below 12.

■ E. Counsel for the relator, while unable to furnish me with any citation of authorities, has asked me to apply by analogy a great number of cases cited on the subject of "Sleeping Jurors." [3] These cases all relate to trial by petit jury. A grand jury is an informing and accusing body rather than a trial body, and its duty is to inquire and investigate, not to determine the guilt or innocence of persons accused of crime. United States v. Direct Sales, Inc., D.C., 40 F.Supp. 917.

An indictment may be returned by a vote of 12 to 11 whereas in order to convict upon the trial of that indictment, a petit jury must be unanimous.

■ It appears on the record before this Court that 12 qualified jurors voted for the indictment in compliance with the statute, but these questions were embodied in the motion to dismiss previously mentioned and that the remedy of the relator is to appeal from the order denying that motion in connection with the prosecution of his appeal from the judgment.

F. Another contention of the relator is, that Mr. Burke was not, at the time the indictment was found, and at the time of the trial thereof, admitted to the bar of this court. That is true. Relator relies principally on Rule 3 of the General Rules of this court, which provides:

"Any person who has been for three years a member in good standing of the Bar of the State of New York, or of the Bar of the State of New Jersey, or who has been duly admitted to the Bar of either of those states when a member in good standing for five years of the Bar of some other state or territory or possession or the District of Columbia or of a foreign country, or who is a member in good standing of the Bar of the State of New York and for one year has been a law clerk of a Judge of the Circuit Court of Appeals for the Second Circuit or of a Judge of this Court or an Assistant United States Attorney, or an assistant to the United States Attorney, for the Southern District of New York, may be admitted to practice in this Court on compliance with the following provisions:

"Each applicant for admission shall file at least five days prior to the hearing thereon, with the Clerk of this Court, a written petition for admission, duly sworn to, setting forth the time when, the court where, admitted and his legal training and experience at the Bar. This petition shall be accompanied by affidavits of two attorneys of this Court stating where and when affiants were admitted to practice in this Court, how long and under what circumstances such attorneys have known petitioner, and stating what affiants know of petitioner's character and experience at the Bar. Such petition shall be placed at the head of the Motion Calendar, and, on the call thereof, one of the attorneys whose affidavits accompany the petition shall move the admission of the petitioner, and, if admitted, the petitioner's oath of office shall be taken in open court."

This very rule seems to beg the question, because it recognizes that "an Assistant United States Attorney, or an assistant

---

[3] Stone v. State, 1843, 23 Tenn. 27; People v. Morrissey, 1872, 1 Sheld., N.Y., 285, 295; Pelham v. Page, 6 Ark. 535, 538; Continental Cas. Co. v. Semple, Ky., 112 S.W. 1122; McClary v. State, 1881, 75 Ind. 260, 265; People v. Ung Sing, 1915, 171 Cal. 83, 88, 151 P. 1145; Dolan v. State, 40 Ark. 454, 461; People v. Lee Yick, 189 Cal. 599, 209 P. 538; People v. Nachowicz, 340 Ill. 480, 172 N.E. 812; State v. Mellor, 73 Utah 104, 272 P. 635; United States v. Boyden, 24 Fed.Cas. page 1213, No. 14,632; Slaughter v. Coke County, 34 Tex.Civ.App. 598, 79 S.W. 853; Dick v. Dick, 144 Kan. 183, 58 P.2d 1125; Johnson v. State, 33 Ariz. 354, 264 P. 1083; Braunie v. Nebraska, 105 Neb. 355, 180 N.W. 567, 12 A.L.R. 658; Com. v. Croson, 246 Pa. 536, 92 A. 754; Baxter v. People, 3 Gil. 368, 8 Ill. 368; Hogshead v. State, 25 Tenn. 59; Chicago City Ry. v. Anderson, 93 Ill.App. 419.

to the United States Attorney" may be appointed as such and serve in this district, without being a member of the bar of this court, and of course that has been the law since 1789 by the 35th Section of the Judiciary Act, 1 Stat. 92. Section 481 of Title 28 U.S.C.A. provides:

"There shall be appointed in each district, including the District of Columbia, a person learned in the law, to act as attorney for the United States in such district."

There is no other legal requirement to our knowledge, except to take the prescribed oath of office.

However, the question of Mr. Burke's right to appear before the grand jury and conduct the case, was litigated before the trial judge, and, therefore, is not dehors the record.

■ G. Objection is made by the relator that the minutes of the grand jury were turned over to and have ever since been in the keeping of the United States Attorney instead of the Clerk of the Court.

In re District Attorney of the United States, 1872, 7 Fed. Cas. pages 745, 746, No. 3,925, Emmons, Circuit Judge, after charging the grand jury upon the right of the District Attorney and his Clerk to attend before that body, cited Fout v. State, 3 Hayw., Tenn., 98 and said:

"You ask, also, what you shall do with the minutes of the evidence when you are through with your duties. They should be delivered to the district attorney, and be by him kept among the records of the government. They are necessary to enable him to prosecute offenders. Should he be excluded from the jury room and refused the inspection of your minutes of the testimony, the public business of his department could not be conducted; there would be no possible means for the prosecuting attorney officially to learn large classes of facts indispensable to the performance of his duty as a public prosecutor. It is suggested that your oath of secrecy compels you to destroy the evidence you take for the government. The motive for this secrecy is only to prevent untimely publication of the indictment, that offenders may escape, and as some of the books I think rather uselessly add, to prevent defendants from tampering with the witnesses and preparing false testimony. Whatever may be its motive, it does not extend to legitimate calls for your doings by the government, either to testify to what witnesses swore before you, if they swear differently elsewhere, or to enable it to prepare for trial of offenders against whom you find indictments."

No other case and no statutory provision has been called to the attention of the Court challenging the direction given by Judge Emmons with respect to the rightful custodian of the minutes of the grand jury. His opinion with respect to the right of a District Attorney to appear before the grand jury and his duty in the grand jury room has been cited with approval in United States v. Wells, D.C., 163 F. 313, at page 325, and United States v. Rintelen, D.C., 235 F. 787, at page 793.

In McKinney v. United States, 199 F. 25, 29, Judge Hook, writing for the Circuit Court of Appeals for the Eighth Circuit, said:

"There is an unfortunate tendency in criminal jurisprudence to raise minor matters to the dignity of substantial rights. The plain safeguards against governmental and private oppression have become by judicial action so embedded in nonessential additions and technical refinements that their true limitations are not always clear, and it not infrequently happens that criminal trials become mere adroit contests in which substance yields to form and the search for truth is diverted to and ends in collateral inquiries. * * * Of course fundamental safeguards should not be frittered away, but the growth of judicial construction should also be with due regard to the just rights of society and the practical conduct of trials."

If there are any other contentions made by the relator which are not mentioned, it is because they were not regarded as of sufficient merit to warrant further discussion within the stated decision of the United States Supreme Court.

Petition must be denied and the relator remanded. Settle order.

NOTE: Upon the hearing before me what purports to be a copy of the testimony before the trial judge was produced and marked Exhibit "X" for identification. A copy was made available to the relator and certain excerpts were read in evidence. It further appears that the relator has submitted to the trial judge and he has passed upon assignments of error and has settled the record. Presumably the relief sought by the relator and denied him herein may likewise be brought on for review with the appeal from the judgment and any intermediate orders in connection therewith.